**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

EDD BALLOU, RICHARD NOLL, )
and TORRUS PHILLIPS, on behalf of )
themselves and all others similarly )
situated, )
 )
   Plaintiffs, )
 )
v. )  **No. 3-03:1055**
 )  **JUDGE HAYNES**
DET DISTRIBUTING COMPANY, )
 )
   Defendant. )

## MEMORANDUM

Plaintiffs, Edd Ballou, Richard Noll and Torrus Phillips, filed this action on behalf of themselves and all others similarly situated under of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., against the Defendant, DET Distributing Company, their employer. After entry of an Agreed Order for Notice of Opt-Ins for similarly situated workers, (Docket Entry No. 17), Mark Gipson and Gary Crawford joined this action as additional Plaintiffs. (Docket Entry Nos. 18 and 19). Plaintiffs' claims are that DET failed to pay overtime wages for their work hours in excess of forty hours during a work week. Plaintiffs seek compensation for lost overtime wages and benefits as well as liquidated damages, pre-judgment interest and their reasonable attorneys' fees and costs.

Before the Court is Defendant's motion for summary judgment (Docket Entry No. 33), contending, in sum: (1) that Plaintiffs are exempt from the FLSA overtime provisions under the Motor Carrier Act ("MCA") exemption because federal regulations govern Plaintiff's qualifications

1

to work and the Defendant's products at issue that are in a constant stream of interstate commerce; and (2) the combination of the Plaintiffs' executive and outside sales duties constitute Plaintiffs' primary work and also renders them exempt from the FLSA's overtime compensation requirements. (Docket Entry No. 34, Plaintiff's Memorandum at pp. 14, 24 and Docket Entry No. 46 at pp. 1-9).

In their response (Docket Entry No. 43), Plaintiffs assert, in essence, that the MCA's exemption is unavailable here because the Plaintiffs' job activities do not involve "interstate commerce," "interstate transportation" or interstate travel. In Plaintiffs' view, their job activities determine the applicability of the MCA exemption, not the character of the Defendant's business. Plaintiffs also assert that the combination exemption is inapplicable here because Plaintiffs' primary duties were neither administrative nor executive nor outside sales work. Plaintiffs argue that they did not exercise discretion or independent judgment in the performance of their duties so as to qualify under the executive exemption in the FLSA. Finally, Plaintiffs assert that their payroll checks were subject to deductions for cash or inventory shortages, precluding any executive exception.

For the reasons set forth below, the Court concludes that based upon applicable law and undisputed facts, the Defendant's business involves a practical continuity of interstate commerce, and Plaintiffs' work for the Defendant is subject to regulations of the United States Department of Transportation. Thus, the Defendant's proof establishes that the MCA exemption applies to Plaintiffs. Thus, Plaintiffs are not entitled to overtime compensatory under the FLSA. The Court, however, concludes that the Defendant has not shown by clear and convincing evidence that the combination exemption of executive and outside sales duties obtains here.

2

## A. Findings of Fact[1]

DET, a licensed wholesale beer distributor, operates a distribution warehouse in Nashville, Tennessee. (Docket Entry No. 43, p. 1). DET is the exclusive distributor of Miller Brewing Company's beer products and other brands of beer within its designated nine county territory in Middle Tennessee. DET must meet the product needs of its licensed retailers in its assigned territory. Id. at 2. Under state law, DET cannot engage in retail sales of its products and by operation of law, DET's products "pass[] through" to licensed retailers. (Docket Entry No. 42, Plaintiff's Response to Defendants Statement of Material Facts at ¶ 5). DET receives beer at its Nashville warehouse suppliers, with approximately 90% of DET's products from states other than Tennessee as well as from Mexico and Europe. Id. at ¶ 6.

DET stores its beer in the warehouse, but some brewers maintain control over their products in various ways, including requiring their products to be stored at certain temperatures and light settings as well as monitoring the age of the product to be sold to retailers. Id. at ¶ 7. The brewer must approve the equipment to maintain the designated temperature and can prohibit sales of out-of-date beer and require removal of such beer from retailers' locations. Id. The brewer is also connected electronically to Defendant's inventory tracking system so as to monitor receipt of its products at the warehouse and their products' delivery to retailers in DET's distribution territory.

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). Upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp., 477 U.S. 317, 326 (1986). From a review of the parties' responses to each other's statement of undisputed facts (Docket Entry Nos. 42 and 47) and the applicable law, the Court finds that there are not any material factual disputes. Thus, this section constitutes findings of fact under Fed. R. Civ. P. 56(d).

3

Id. at ¶ 8, ¶¶ 13 and 30. DET does not process or modify the beer other than occasionally to repackage damaged products from containers that must be cleaned and or repaired. Id. at ¶14.

All beer is ordered and shipped to be forwarded to specific licensed retailers in Defendant's assigned territory. Forty to 50% of DET's retailers are chain stores that are considered "off-premises" retailers. (Docket Entry No. 36, Draper Affidavit at ¶9) About 40% of DET's other retailers are "significant retailers" whose purchases are highly constant and those retailers represent about 50% of DET's retailers. Id. The remaining 5% are small retailers whose purchases can vary. Id. The DET products to these retailers are sold as packaged goods or kegs. See Docket Entry No, 39, Phillips Deposition at p. 19). One of the Plaintiffs, Crawford collects empty kegs for return to the brewer. (Docket Entry No. 37, Crawfoed Deposition at pp.59-60.

In some instances, DET does not actually sell the beer. Miller Brewing Company negotiates unilaterally and directly with significant retailers in DET's distribution area without DET's involvement, but Miller Brewing informs DET of the products to be sold and delivered. (Docket Entry No. 42, Plaintiffs' Responses to the Defendant's State of Undisputed Facts at ¶ 31 and Docket Entry No. 36 Draper Affidavit at ¶ 9). In those instances, Miller Brewing actually sells the products before DET ever receives the products. (Docket Entry No. 42, Plaintiffs' Responses to the Defendant's State of Undisputed Facts at ¶ 32).

Although all of DET's actual deliveries to retailers occur within the state of Tennessee, id. at ¶ 34, for its deliveries of its products, DET utilizes "combination vehicles" or "tractor trailers" that are governed by DOT Safety Regulation 383.91. Id. at ¶ 35. On occasion, DET uses a "heavy straight vehicle" that is also covered by DOT Safety regulations. Id. at ¶ 18. To operate these vehicles, DET requires a Class A commercial driver's license from the DOT. Id. at ¶¶ 32, 38, see

4

also Docket Entry No. 36, Draper Affidavit at ¶ 17. Because the Route Sales Supervisors were required to be available every day to drive routes, DET requires every Route Sales Supervisor to have a Department of Transportation ("DOT") Class A commercial drivers licenses, to undergo periodic random drug screening and to undergo the biannual physical examination that are required by DOT. (Docket Entry No. 42, Plaintiffs' Responses to the Defendant's Statement of Undisputed Facts at ¶ 49). Further, as required by DOT, every Route Sales Supervisor must notify DET of any traffic violations on his Class A CDL. Id. at ¶ 50.

Prior to 2002, DET driver-salesmen were assigned a route with retailers based upon their daily "load sheet" that represented the amount of inventory necessary for deliveries on that route. Id. at ¶ 15. Miller and DET provided these sheets based upon specials and the sales at a particular retailer. Id. at ¶¶ 16, 19. The load sheet was downloaded from a handheld computer and the following day, the driver's truck was loaded as designated by daily load sheet. Id. at ¶ 17. In each instance, from data provided by Miller and DET on his load sheet, the driver-salesman evaluates the stock to determine whether to replace or rotate the stock, so as to ensure an ample supply of fresh product. Id. at ¶¶ 16, 17, 19. After that determination, the driver meets with the retailer's on-site manager to complete the sale. Id. The driver-salesman then writes an invoice and collects a check or cash for the sale, because state law does not authorize credit sales. Id. at ¶ 20. In addition, each driver-salesmen visits each retail store weekly to discuss all aspects of each week's sales, deliveries and orders for the following week. Id. at ¶ 18. The driver-salesman's historical knowledge of each site also assists in the preparation of the load sheet for the next visit to that retailer. Id. at ¶ 21.

In 2002, DET began an eighteen (18) month process to change its distribution system to a "presale delivery" from its prior direct sales method. Id. at ¶ 22. Under the pre-sale delivery system,

5

before sale and delivery, the salesman visits a retailer and evaluates the amount of products needed, as did the former "driver-salesman" under the direct sales method. Id. at ¶ 24. After receipt of orders from the pre-salesmen, DET's warehouse personnel prepares a "pick list" for each retail location and the next day, the deliver driver pulls the pre-sold merchandise to load onto the trucks for delivery. Id. at ¶ 25. In a word, the trucks are loaded with inventory based on actual sales, as opposed to a driver-salesman's estimated sales. (Docket Entry No. 36, Draper Affidavit at ¶ 14). During the transaction period, DET continued to utilize some driver salesmen on some routes. Id. Under both distribution methods, DET utilizes a forecasting system, including data on the manufacturer's "inventory target," the season of the year, retailer sales and marketing, the brewer's sales and marketing. Id. at ¶ 15 and Docket Entry No. 42, Plaintiffs' Response to Defendant's Statement of Undisputed Facts at ¶¶ 28, 29.

The Route Sales Supervisors assign new retailers to routes, redistribute stops on routes to ensure equitable profitability for driver salesmen and train new driver-salesmen. These Supervisors reported traffic violations and poor work performance to their supervisors, but DET's higher management actually decides any disciplinary issues. Id. at ¶¶ 44 and 50. (Docket Entry No. 42, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶¶ 41 and 42). As Route Sales Supervisors, Plaintiffs were expected to visit each customer on a regular basis and make personal contact with the managers. See Docket Entry No. 39, Noll Deposition at pp. 45, 47. At each establishment, Plaintiffs assisted salesmen in stocking product, removing damaged product, preparing point of sale displays, ensuring ample shelf place for product placement and cleaning windows. (Docket Entry No. 47, Defendant's Response to Plaintiffs' Statement of Undisputed Facts at ¶ 3). In one instance, the Plaintiff Crawford would transport kegs for return to the brewer, See

6

Docket Entry No.37, Crawford Deposition at pp. 59-60). When DET employees were represented by a union, these Route Sale Supervisors were not covered by the Collective Bargaining Agreement. (Docket Entry No. 36, Draper Affidavit at ¶ 21).

Under both distribution methods, Route Sales Supervisors are responsible for supervision and training of both direct and pre-sales personnel, route sales personnel, relief sales personnel and delivery specialists assigned to them. (Docket Entry No. 42, Plaintiffs' Response to Defendant's Statement of Undisputed Facts at ¶ 39). Under both distribution methods, a Route Sales Supervisor has to drive a route, if necessary and these supervisors often did so. Id. at ¶¶ 27, 47. Route Sales Supervisors drive a route for a few days or up to a week during the training of a new driver or when a driver under their supervision took leave or failed to report for work, or to cover for a driver supervised by another Route Sales Supervisor, if necessary. Id. at ¶¶ 47 and 48. Route Sales Supervisors trained new driver-salesmen by driving with them, introducing them to establishments on their route and overseeing their driving and work performance to determine when the driver-salesman trainee could assume full responsibility for the route. Id. at ¶ 43. DET did not expect that a Route Sales Supervisors would be regular drivers, and for weeks, Plaintiffs did not have to drive at all, and under the pre-sales method, the Defendant tried to minimize Plaintiffs' driving time. (Docket Entry No. 47, Defendant's Response to Plaintiffs' Statement of Undisputed Facts at ¶¶ 5 and 6).

Plaintiffs, former Route Sales Supervisors at the Defendant's warehouse in Nashville, Tennessee, were not affected by the change in the sales process. (Docket Entry No. 47, Defendant's Response to Plaintiffs' Statement of Undisputed Facts at ¶ 51). In the pre-sales systems, the Plaintiffs would not sell to retailers. (Docket Entry No. 47, Defendant's Response to Plaintiffs'

7

Statement of Undisputed Facts at ¶ 21). At all times relevant in this case, Ballou was a Route Sales Supervisor under the direct sales method. Id. at ¶ 52. Gipson's job duties changed with the pre-sales method only in that he had more persons to supervise, and his personal drive was reduced to once or twice a month at times Gipson performed pre-sales duties. Id. at ¶ 53.

Route Sales Supervisors' salaries are in excess of two hundred and fifty dollars ($250) per week with incentive pay. Id. ¶ 54. Plaintiffs' total pay varies, however, based on their scheduled duties for a particular week, the scheduled duties of their subordinates, the skill level of their subordinates and the volume of products sold. Id. Plaintiffs are also subject to disciplinary deductions for cash shortages, inventory shortages, equipment losses and insurance deductibles, but such deductions are infrequent. Id. Despite such deductions, each Plaintiff still received at least $250 per week, id. at ¶ 56 and at times this compensation would consist of only incentive pay. (Docket Entry No. 36, Draper Affidavit at ¶ 24).

## B. CONCLUSIONS OF LAW

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

8

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.

<u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex</u>, 477 U.S. at 326. Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989). But see <u>Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in <u>Celotex</u>:

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule

9

56(c) standards." <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986).  The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. <u>Sims v. Memphis Processors, Inc.</u>, 926 F.2d 524, 526 (6th Cir. 1991) (quoting <u>Kochins v. Linden-Alimak, Inc.</u>, 799 F.2d 1128, 1133 (6th Cir. 1986)).  "So long as the movant has met its initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 353 (6th Cir. 1989) (quoting <u>Celotex</u> and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting <u>Liberty Lobby</u>).  Moreover, the Court of Appeals explained that:

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

<u>Street</u>, 886 F.2d at 1480 (citations omitted).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party</u>.
>
> * * *
>
> Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>.  If the defendant in a run-of-the-mill civil case moves for

10

summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.</u> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'</u>

<u>Liberty Lobby</u>, 477 U.S. at 252 (citation omitted and emphasis added).

It is likewise true that:

[I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Company</u>, 791 F.2d 43, 46 (6th Cir. 1986) <u>app.</u> 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation omitted).

The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion:

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to 'designate' facts by citing specific page numbers. Designate means simply 'to point out the location of.' <u>Webster's Third New InterNational Dictionary</u> (1986).
Of course, the designated portions of the record must be presented with enough

11

specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989).

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1.      Complex cases are not necessarily inappropriate for summary judgment.

2.      Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.      The movant must meet the initial burden of showing `the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4.      This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.      A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6.      As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.      The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.      The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.      The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.     The trial court has more discretion than in the `old era' in evaluating the respondent's evidence. The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

The FLSA requires employers to pay its employees time and a half for all work performed in excess of forty hours per week. 29 U.S.C. § 207(a)(1). Any statutory exemptions from FLSA's overtime compensation requirements are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." Arnold v. Ben Kanowski Inc., 361 U.S. 388, 392 (1960). Under the FLSA, "the [employer] must establish through 'clear and affirmative evidence'... every requirement of the exemption" and any exemptions are to be narrowly construed." Ale v. Tenn. Valley Auth., 269 F.3d 680, 691, n.4 (6th Cir. 2001)(quoting Roney v. United States, 790 F. Supp. 23, 26 (D.D.C. 1992) and citing, Arnold and Douglas v Argo-Tech Corp, 113 F.3d 67, 70 (6th Cir. 1997)).

### 1. The "Motor Carrier Act Exemption"

Under Section 13(b)(1) of the FLSA, the overtime provisions of the Act do not apply to any

13

employee who is subject to the authority of the Secretary of the Department of Transportation ("DOT"), under the Motor Carrier Act ("MCA"), 49 U.S.C. § 31502. This subsection of the FLSA provides, in pertinent part:

> (b) Maximum hour requirements
> The provisions of section 207 of this title shall not apply with respect to – –
> (1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31505 of Title 49.

29 U.S.C. § 213 (b)(1). This exemption applies even if the Secretary has not actually exerted authority over a particular employer or the property at issue, as long as the Secretary's statutory authority could extend to regulate that employer or employee activity. Benson v. Universal Ambulance Serv. Inc., 675 F.2d 783, 785 (6th Cir. 1982).

Transportation within the meaning of the MCA is defined as where passengers or property are transported by motor private carrier—

> (1) between a place in—
>
> (A) a state and a place in another State;
>
> (B) a State and another place in the same state through another state;

49 U.S.C. §13501. The MCA defines "motor private carrier"[2] as:

> A person, other than a motor carrier, transporting property by motor vehicle when—
>
> (A) the transportation is as provided in section 13501 of [title 49];
> (B) the person is the owner, lessee, or bailce of the property being transported; and
> (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

---

[2]"The MCA uses the term "motor private carrier' but this term is synonymous with "private motor carrier."

14

49 U.S.C. § 13102(13).

As a threshold matter, the Court deems it necessary to distinguish between interstate commerce standards under the FLSA and MCA that are different. As the Sixth Circuit explained in Baird v. Wagoner Transp. Co., 425 F.2d 407 (6th Cir. 1970).

> The scope and meaning of 'interstate commerce' in each Congressional Act presents a 'unique problem in which words derive vitality from the aim and nature of the specific legislation.' Federal Trade Commission v. Bunte Brothers, 312 U.S. 349, 351, 61 S.Ct. 580, 85 L.Ed 881 (1940). Whereas the FLSA covers employees 'engaged in commerce or in the production of goods for commerce' 29 U.S.C. 203, 207(a)(1), the MCA only covers employees actually 'part of a continuous movement in interstate commerce.' Shew v. Southland Corporation (Cabell's Daiary Div.), 370 F.2d 376, 380 (5th Cir. 1966). Whereas the former Act would apply to employees 'in the production of goods for commerce' even though such employees handled or sold such goods prior to or after their actual 'continuous movements' in interstate commerce, the MCA would not. Galbreath v. Gulf Oil Corporation, 413 F.2d 941 (5th Cir. 1969), 29 U.S.C. 203(s).

Id. at 410 (emphasis added).[3]

As reflected in the Sixth Circuit decisions cited by Plaintiffs, at one time, the former Interstate Commerce Commission's authority was apparently "limited to those employees whose activities affect the safety of the operation." West Kentucky Coal co . Walling, 150 F.2d 582, 586 (6th Cir. 1946) (quoting United States v. American Trucking Assn. 310 U.S. 534. (1940) and citing Fletch v. Grinnell, 150 F.2d 357 (6th Cir. 1945)). Plaintiffs also rely upon West Kentucky Coal that characterized Fletcher as holding that the MCA "exemption applies only if the employees in question

---

[3]Based upon that distinction, the Defendant's reliance on Walling v. Jacksonville Paper Co., 317 U.S. 564 (1943) decided under the FLSA, as controlling may be misplaced, at least in part. See Packard v. Pittsburg Transp. Co., 418 F.3d 246, 260 n.11 (3rd Cir. 2005) ("As the majority points out, . . . the contours of interstate commerce under the Motor Carrier Act and the Fair Labor Standards Act are different. See 29 C.F.R. § 782.7(a). Thus, Walling has no bearing upon the scope of the Motor Carrier Act exemption. The Courts of Appeals relying upon the case to determine the scope of the exemption have done so in error." (Nygaard J. concurring).

Case 3:03-cv-01055   Document 48   Filed 07/17/06   Page 15 of 34 PageID #: 319

have devoted a substantial part of their time to driving motor vehicles in interstate commerce." 153 F.2d at 586.

In the Court's view, it is necessary to evaluate these decisions in light of subsequent legal developments. The decisions that are relied upon by Plaintiffs, predate Morris v. McComb, 332 U.S. 422, 431-32 (1947), wherein the Supreme Court addressed the MCA exemption and determined that "it is 'the character of the activities rather than the proportion of either the employee's time or of his activities that determines the actual need for the [DOT's] power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment.' " (quoting Levinson v. Spector Motor Service, 330 U.S. 649, 674-75 (1947)). In Morris, the Supreme Court held that a group of truck drivers was subject to the MCA although none of them crossed state lines and only 4% of their shipments involved goods destined to, or arriving from, another state. 332 U.S. at 427.

In addition, in 1966, Congress passed the Department of Transportation Act, effective on April 1, 1967, that transferred to DOT "all functions, powers, and duties of the Interstate Commerce Commission" with regard to the hours and safety provisions of the MCA. Executive Order 11,340, March 30, 1967, pursuant to Pub.L. 89-670, sec. 15, 80 Stat. 950. As reflected in its statutory wording of Section 213(b)(1) of the FLSA and the decisions under the MCA, the Secretary of the Department of Transportation has assumed the responsibility for defining the scope of the MCA exemption in Section 214(b). As discussed infra, courts determine the MCA exemption by focusing on how the employer's business *and* the employees' activities affect interstate commerce.

In Baird, the Sixth Circuit addressed the scope of interstate commerce for this MCA exemption and affirmed a district court's reliance on an ICC opinion setting forth standards to

16

consider on this exemption:

> In Ex Parte No. MC-48, the Commission specifically indicated that truck drivers are not engaged in interstate commerce' under the MCA and not subject to the jurisdiction of the Commission where the following three factors are present: (1) 'specific orders' of a 'specific quantity' are not moved from one state through the terminal storage of a second state to a specific customer; (2) the use of the terminal storage as a 'local marketing facility' from which products are sold or allocated;' and (3) transportation in the furtherance of such 'distribution within a single state is specifically arranged only after sale or allocation from storage.'
>
> * * *
>
> It must be noted that in the instant case forecast, not actual orders by customers, were the basis of the shipments of petroleum products from Whiting, Indiana to Uskegon, Michigan. Further, such forecasts merely reflected the anticipations of customers' needs because Standard had not entered into 'requirements contracts' or 'specific quantity' arrangement before shipping to the Muskego terminal. Also, Standard's occasional need to buy or borrow petroleum form nearby competitors to fill customers' orders indicates the 'inventory' status of the goods at the terminal. Finally, the low 'through-put' of the Muskego terminal suggests that the products stored there 'come to rest' before being delivered to Wagoner's drivers for transportation wholly within Michigan.

425 F.2d at 411, 412 (emphasis added)[4]. The Court distinguished other circuits' decisions that

---

[4] The Court notes that in 1992, the ICC listed several factors in analyzing whether goods remain in interstate commerce beyond the terminal storage point. Those DOT factors include:(1) Whether the goods are ordered based on projections of customer demand that have some factual basis, including without limitation, historical sales, actual present orders, and relevant market surveys of need.(2) Whether the goods undergo processing or substantial product modification of substance while at the warehouse or distribution center, but repackaging or reconfiguring (secondary packaging) may be performed.(3) Whether while in the warehouse, the merchandise is subject to the shipper's control and direction to the subsequent transportation (4) Whether modern tracking systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse or distribution center. 57 Fed. Reg. 19812, May 8, 1992 reprinted at 1992WL93608. First, the beer shipped through DET's warehouse is ordered based upon a historical data or pre-sales by brewers. Second, DET does not conduct any processing or product modification at its warehouse. Third, beer shipped to DET's warehouse remains under the manufacturer's continued control of storage parameters and times limits for sale. Finally, brewers are "plugged into" DET's data systems and monitor their products at

17

"involved shipments made with a fixed intent of continuous movements." Id. at 412.[5]

As discussed below, Baird appears, in effect, to incorporate the Walling type standards under the FLSA to decide interstate commerce issues under the MCA exemption. In Walling, the Supreme Court analyzed whether goods purchased by a wholesaler in interstate commerce for sale and distribution to in-state retailers, and temporarily stored in a warehouse before distribution to retailers, remained in interstate commerce for purposes of the FLSA. The Court outlined the three similar fact patterns to those in Baird: (1) where the goods were ordered under a preexisting contract between the retailer and shipper; and (2) where the goods were ordered by the wholesaler/distributor to meet the needs of specified customers based upon some understanding with the customers. 317 U.S. at 568-69. In Morris, the Supreme Court ruled that the MCA exception may also apply where the goods were ordered based on anticipation or "understanding" of the needs of specific customers. Id.

In Vaughn v. Watkins Motor Line, Inc., 291 F.3d 900, 904 (6th Cir. 2002), the Sixth Circuit explained that Motor Carrier Act ("MCA") "gives the Secretary of Transportation ... 'the authority to regulate the hours of two categories of employee: (1) *who works for a private motor carrier that provides transportation in interstate commerce and* (2) whose work activities affect the safety of operation of that motor carrier." (emphasis added).

Other circuits have reached same conclusion in similar factual settings. In Bilyou v.

_____

DET's warehouse. Thus, DET would satisfy these ICC standards for conducting business in interstate commerce.

[5]Although not controlling on the MCA exemption, the FLSA regulations adopt essentially the same definition. See 29 C.F.R.§782.7(b)(1) (interstate commerce requirement is satisfied "where the vehicles do not actually cross State lines but operate solely within a single State, if what is being transported is actually moving in interstate commerce.").

18

Dutchess Beer Distributors, Inc., 300 F.3d 217, 223 (2nd Cir. 2002), the Second Circuit ruled the MCA's exemption attached to an employee of a intrastate beer distributor, noting that the MCA coverage extends to the . . . "essential character of the commerce, [that is] reflected by the intention formed prior to shipment, pursuant to which the property is carried to a selected destination by a continuous or unified movement.") (quotation marks and citations omitted). In word, Bilyou holds that transportation within a single state is considered to be "between a place in a State and a place in another state" under § 13501, if the goods being transported within the borders of one state are involved in a "practical continuity of movement" i.e., across state lines from the point of origin to the point of destination. Id. at 223 (citing Walling., 317 U.S. at 568).

The Third Circuit collected decisions from other Circuits that apply the "practical continuity of movement test to the employer's business to determine whether the MCA exemption applies to its employees. The Third Circuit also referred to these decisions as involving employers with "an integrated system of interstate shipments." Pittsburgh Transp. Co., 418 F.3d at 255,citing Bilyou, 300 F.3d at 223-24 (MCA exemption found for employee of beer wholesaler that delivered products within a state and "Klitzke v. Steiner Corp., 110 F.3d 1465, 1470 (9th Cir. 1997) (involving local delivery driver for linen service that ordered roughly half of the materials it supplied from out-of-state suppliers, based on specific customers' orders); Foxworthy v. Hiland Dairy Co., 997 F.2d 670, 672 (10th Cir. 1993) (involving Oklahoma truck driver who regularly delivered dairy products ordered from his employer's Arkansas plant to customers in Oklahoma); Beggs v. Kroger Co., 167 F.2d 700 (8th Cir. 1948) (involving truck drivers who regularly delivered merchandise-89% of it from outside the state-to their employer's retail groceries from its warehouse, and who returned empty bottles and unsold merchandise to the warehouse for shipment out of state)."

19

Thus, the Court concludes that Plaintiffs err in contending, as a matter of law, that the Plaintiffs' activities alone determine the applicability of MCA exemption. The Court must consider the Defendant's business *and* Plaintiffs' role in that business. To conclude otherwise would allow the employer that is engaged in interstate commerce to manipulate the employee's activities to avoid FLSA coverage.

Here, it is undisputed that almost all of the beer that is transported from other states and countries to DET's Nashville warehouse is to be transported to DET's licensed retailers in Middle Tennessee. DET has an exclusive license under state law and distributes beer within a specified geographical area. DET is required by state law and has an understanding with licensed retailers to distribute these beer products in sufficient quantity to meet the requirements of its retailers. The beer is shipped to DET's Nashville warehouse pursuant to "an understanding implied by law" to "meet the needs of specific customers"—i.e., the limited universe of licensed retailers within DET's distribution area. DET's failure to meet this obligation jeopardizes its license and franchise agreement with brewers. DET's largest supplier actually delivers products to DET based upon that brewers sale of its product by direct communication with DET's retailers. One of the Plaintiffs, Crawford, actually collects empty beer kegs from retailers for return to the out-of-state brewer.

The Supreme Court in <u>Morris</u> noted that "a wholesaler's course of business based on <u>anticipation of needs of specific customers</u>, rather than on prior orders or contracts, might ... at times be sufficient to establish that practical continuity in transit necessary to keep a movement of goods 'in commerce.'" <u>Id.</u> at 570. A corollary of <u>Baird</u> is that the MCA exemption attaches where "specific orders' of a 'specific quantity' are ... moved from one state through the terminal storage

20

of a second state to a specific customer...". 425 F.2d at 411-12.

For these reasons, the Court finds concludes that beer shipped from DET's warehouse to DET's retail customers remains in a practical and continuous stream of interstate commerce. DET's activities "form a part of a 'practical continuity of movement' across state lines from the point of origin to the point of destination." Bilvou, 300 F.3d at 223. Therefore, the Court concludes that Plaintiffs are employees of a private motor carrier that engages in the interstate transportation of property for sale. The Court concludes that the DET has clearly established the first factor on the MCA exemption's applicability to Plaintiffs' work at DET.

This conclusion is in accord with the recent decision in Talton v. I. H. Caffey Distributing Co.. Inc., 124 Fed. Appx. 760 (4th Cir. 2005), wherein the Fourth Circuit relied on Walling and determined that beer being transported entirely within the borders of North Carolina remained in interstate commerce despite its "pause" at the wholesale distributor's warehouse. Id. at 762 In Caffey, the Plaintiff was a former delivery route driver for a malt beverage and wine wholesaler/distributor, licensed by the North Carolina Alcoholic Beverage Control Commission as the exclusive distributor of Miller, Coors, Heineken, Guinness, St. Pauli, and Pabst beer products for certain North Carolina counties. Id. 761-62. The defendant received its beer from various manufacturers inside and outside North Carolina, as well as from outside the United States. Id.. The beer would be delivered from the brewer to the Defendant's warehouse and would then be sold and distributed to retailers. Id. at 766.

The Caffey Plaintiff, a "swing-route driver", worked as needed on any route for a missing driver on routes within North Carolina. The Caffey Plaintiff's duties included printing invoices for

beer, obtaining the retailer's approval for the beer, unloading, pricing, stocking and securing payment for the beer sold. Id. at *4. In response to the plaintiff's FLSA overtime claims, the beer distributor asserted the MCA exemption. Id. at *5. The Fourth Circuit described the issue as "whether the beer's pause in [the defendant's] warehouse was of such a character to bring its interstate journey to an end." Id. at *10.

The Fourth Circuit held that "the products handled and distributed by [plaintiff] continued to be in interstate commerce even though they had temporarily paused at the Greensboro warehouse." Id. at * 16. The Fourth Circuit concluded that the second Jacksonville Paper Co. category applied because, "by operation of North Carolina's ABC law, the licensed retailers had an 'understanding' with Caffey [Distributing] that Caffey [Distributing] was required to provide them with enough beer to meet their sales needs." Id. at 766. Based upon this understanding, the Court concluded that the destination of a given shipment of beer was not the warehouse, but the retailers for whom the beer had been purchased. Id. Thus, the Fourth Circuit found that the MCA exemption to bar the driver's FLSA overtime claim. Id.

As to the activities of the Plaintiffs in DET's business, Plaintiffs participated in the transport of the beer products to DET's retailers. Plaintiffs were substitute drivers for DET to deliver these products, as necessary. Although Plaintiffs' assigned routes did not cross state lines, Plaintiffs' licenses and driving activities were regulated by the DOT and the vehicles that they drove were subject to DOT safety regulations. The trucks that Plaintiffs drove were covered by DOT safety regulations. Plaintiffs also had to pass a DOT physical and drug test and report any moving violations. (Ballou at 30-31; Crawford at 50-52; Gipson 39-40.) Further, when driving a truck, Plaintiffs were also responsible for completing Vehicle Inspection Reports.

22

(Ballou at 31; Crawford at 74-75, Exhibit 2; Gipson at 38.) Plaintiffs were required to maintain a Class A CDL, pass DOT written tests and driving tests, and complete various DOT forms.

Drivers "engaged in performing tasks that affect the safety of vehicles operating in interstate commerce" include those drivers who are required to complete Department of Transportation logs on time spent driving, to pass DOT written and driving tests, to complete various forms required by the DOT and to pass a DOT physical and drug test. See Barefoot v. Mid-America Dairymen, 826 F.Supp. 1046, 1050 (N.D. Tex. 1993)(citing Thomas v. Witchita Coca-Cola Bottling Co., 968 F.2d 1022, 1026 (10th Cir. 1992). If a part of "an interstate motor carrier employee's services affect safety of operations and the rest of his services do not, he is nevertheless within the power of the [Secretary of Transportation]". Tobin v. Mason & Dixon Lines. Inc., 102 F.Supp. 466, 469 (E.D. Tenn. 1951).

The Department of Transportation has also issued opinion letters to provide additional guidance to advise employers about FLSA exemption. Where a carrier has been shown to operate in interstate commerce, the Secretary of Transportation will assert jurisdiction over an employee for a 4-month period beginning on the last date the employee could have been called upon to make an interstate run. See FOH § 24e01(b) (May 13, 1982)(emphasis added).

For these reasons, the Court concludes that Plaintiffs are employees "engaged in performing tasks that affect the safety of vehicles that operate in interstate commerce. Based upon their driving duties and DOT's compliance, Plaintiffs would qualify under the "4-month rule" and Plaintiffs would be subject to the jurisdiction of the Secretary of Transportation throughout the course of their employment as Route Sales Supervisors. The Court finds that DET's employees are "engaged in

23

performing tasks that affect the safety of vehicles and engage in activities that affect interstate commerce".

Therefore, the Court concludes that DET thereby has established the second factor on the MCA exemption as defined by the Sixth Circuit in Vaughn, 291 F.3d at 904. Thus, Plaintiffs are exempt from the overtime provisions of the FLSA under the Motor Carrier Act exemption in Section 213(b)(1) of the FLSA.

### 2. The Combination (Executive-Outside Sales) exemption

In addition to the MCA exemption, DET also argues that based upon the nature of the Plaintiffs' work, the "combination exemption" under the FLSA applies to bar Plaintiffs' overtime compensation claims. The FLSA provides, in pertinent part:

> The provisions of section 206( except subsection (d) of this subsection) and section 207 of this title shall not apply with respect to– (1) any employee in a bona fide executive, administrative, or professional capacity ... or in the capacity of outside salesmen(as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of subchapter 5 of Title 5, except that an employee of a retail or service establishment shall not be excluded from the definition of employee in a bona fide executive or administrative capacity because of the number of hours in his work week which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in a workweek are devoted to such activities...

29 U.S.C. §213(a)(1).

As to the combination exemption, "29 C.F.R.§ 541.600 allows the 'tacking' of exemptions only where (1) an employee performs more than one type of work that would be exempt except that (2) neither type of work alone can be termed the employee's primary duty, but (3) all of the putatively exempt work taken together constitutes the employee's primary duty." Dalheim v. KDFW-TV, 918

24

F.2d 1220, 1232 (5th Cir. 1990), citing International Association of Fire Fighters, Alexandria Local 2141 v. City of Alexandria, 720 F.Supp. 1230, 1232, 1233-34 (E.D. Va. 1989), aff'd without opinion, 912 F.2d 463 (4th Cir. 1990); Cobb v. Fines Foods, Inc., 582 F.Supp. 818, 822 (E.D. La. 1984), aff'd 755 F.2d 1148 (5th Cir. 1985).

In Auer v. Robbins, 65 F.3d 702 (8th Cir. 1995) aff'd on other grounds, 519 U.S. 452 (1997), the Eighth Circuit stated:

> "In combination exemptions, however, the employee must meet the stricter of the requirements on salary and non-exempt work." In other words, the employer must show that the employee falls within a combination of the long tests, and cannot rely on a combination of the short tests. This means that an employee will qualify for a combination exemption only if he does not devote more than 20% of his time to nonexempt work. 29 C.F.R. §§ 541.1(E), 541.2(d). Because the district court made no factual findings regarding the amount of time the special assignments sergeant spent on exempt and nonexempt job duties, it is impossible to determine whether or not the combination exemption applies.

Id. at 722. Accord, Stricker v. Eastern Off Road Equipment, Inc., 935 F.Supp. 650, 654 (D. Md. 1996).

## A. The Bona Fide Executive Exemption

As to whether an employee is a "bona fide executive" within the meaning of § 213(a)(1), the Sixth Circuit has succinctly defined a bona fide executive "as an employee with supervisory duties who is paid on a salary basis". Michigan Supervisors' Office and Professional Employees Intern. Union v. Michigan Depts. of Corrections, 61 F.3d 904, 1995 WL 418069** (6th Cir. 1995), (quoting Michigan Assn. of Government Employees v. Michigan Dept. of Corrections, 992 F.2d 82, 83 (6th Cir. 1993) (per curiam). To qualify the "employee must have both supervisory duties and be paid on a salaried basis". Id.

25

The FLSA Administrator delineated the following factors to determine this exemption issue and a "bona fide executive" is one:

(a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department [or] subdivision thereof; and

(b) Who customarily and regularly directs the work of two or more other employees therein; and

(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status or other employees will be given particular weight; and

(d) Who customarily and regularly exercises discretionary powers; and

\* \* \*

(f) Who is compensated for his services on a salary basis at a rate of not less than $155 per week (or $130 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands, or American Samoa), exclusive of board, lodging, or other facilities: Provided, That an employee who is compensated on a salary basis at a rate of not less than $250 per week (or $200 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands or American Samoa), exclusive of board, lodging, or other facilities, and whose primary duty consist of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all the requirements of this section.

29 C.F.R. § 541.1. (emphasis added). See also 29 C.F.R. § 541.119.

Under FLSA regulations, an employee employed in a bona fide executive capacity can be paid on a "salary basis" 29 C.F.R. § 541.1(f). For salary basis compensation, the FLSA regulation provides:

(a) An employee will be considered to be paid "on a salary basis" within

26

the meaning of the regulations if under his employment agreement he monthly receives each pay period on a weekly, or less frequent, basis <u>a predetermined amount constituting all or part of his compensation, which among is not subject to reduction because of variations in the quality or quantity of the work performed</u>. Subject to the exceptions provided below, the employee must receive his full salary for any week in which he performs any work without regard to the number of days or hours worked...

29 C.F.R. § 541.118(a) (emphasis added).

As to deductions from Plaintiffs' salaries, the Supreme Court addressed an employer's policy of deducting from its employees' regular salaries for disciplinary or other reasons. In <u>Auer v. Robbins</u>, 519 U.S. 452 (1997), the Court adopted the Secretary of Labor's interpretation of § 541.118(a) that an employer loses the non-exempt status of an executive or administrative employee, if the employer has an actual practice of making deductions from an employee's salary for disciplinary or other reasons or has a policy that creates a "significant likelihood" of such deductions.

> <u>The Secretary of Labor</u>, in an amicus brief filed at the request of the Court, <u>interprets the salary-basis test to deny exempt status when employees are covered by a policy that permits disciplinary or other deductions in pay "as a practical matter. That standard is met, the Secretary says, if there is either an actual practice of making such deductions or an employment policy that creates a "significant likelihood" of such deductions.</u> The Secretary's approach rejects a wooden requirement of actual deductions, but in their absence it requires a clear and particularized policy--one which "effectively communicates" that deductions will be made in specified circumstances. This avoids the imposition of massive and unanticipated overtime liability. . . in situations in which a vague or broadly worded policy is nominally applicable to a whole range of personnel but is not "significantly likely" to be invoked against salaried employees. <u>Because the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is, under our jurisprudence, controlling unless 'plainly erroneous or inconsistent with the remilation.' That deferential standard is easily met here. Under the Secretary's view, that is not enough to render</u>

27

> petitioners' pay "subject to" disciplinary deductions within the meaning of the
> salary-basis test. This is so because the manual does not "effectively
> communicate" that pay deductions are an anticipated form of punishment for
> employees in petitioners' category, since it is perfectly possible to give full
> effect to every aspect of the manual without drawing any inference of that sort.

Id. at 461 (emphasis added and citations omitted).

As applied here, as Route Sales Supervisors, Plaintiffs train drivers, supervise the performance of their assigned drivers counsel drivers under their supervision and also drive if one of their assigned drivers is on leave and a relief driver were unavailable. Under the prior CBA, Plaintiffs were not covered employees and that fact is consistent with a management function. DET admits that Plaintiffs' were subject to deduction for any various shortages and at times, Plaintiffs' pay was based totally on incentive pay. These undisputed facts establish that Plaintiffs were not "guaranteed a predetermined number of paid hours" and was not paid on a salary basis to qualify for this exemption and therefore, also cannot qualify for the combination exemption.

To complete the analysis of DET's contention, as to the outside salesmen exemption, the Secretary's regulation, 29 C.F.R. § 541.5, provides that the term "employee employed in the capacity of outside salesman," in section 13(a)(1) of the Act shall mean any employee:

(a) who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in:

1) making sales within the meaning of section 3(k) of the Act, or

2) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

(b) whose hours of work of a nature other than that described in paragraph (a)(1) or (2) of this section do not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employer: Provided, that work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work.

28

29 C.F.R. § 541.5.

Section 541.5 requires that the exempt outside salesperson be engaged in either making sales within the meaning of Section 3(k) of the Act or obtaining orders or contracts for services or contracts for the use of facilities. Section 3(k) of the Act defines "sale" to include any sale, exchange, contract to sell, consignment for sale, shipment for sale or other disposition. 29 U.S.C. § 203(k). Section 541.5 requires that an outside salesperson be customarily and regularly engaged "away from his employer's place or places of business. A salesperson who uses a succession of separate locations, such as hotel rooms, for sample display purposes may be engaged in outside sales. 29 C.F.R. § 541.502(b).

Unlike the exemptions that apply to an executive, there is no compensation requirement and no "primary duty" test for the outside salesperson exemption, but such persons are limited in the amount of time they may spend in nonexempt activities. Id. That limit is defined as 20 percent of the hours worked in the workweek by nonexempt employees of the employer. Id. The 20-percent limit is computed on the basis of the hours worked by nonexempt employees of the employer who perform the same kind of nonexempt work that is being performed by the outside salespersons. 29 C.F.R. § 541.507. If the employer has no employees who perform such nonexempt work, then the 20-percent limit is based on a 40-hour workweek and the amount of nonexempt work is limited to eight hours a week. Id. Work performed "incidental to and in conjunction with the employee's own outside sales or solicitation" is exempt work. 29 C.F.R. § 541.5(b). Such work includes any duties performed in furtherance of the employee's own sales efforts, regardless of where the work is performed. 29 C.F.R. §§ 541.503, 541.5(b). Exempt activities include incidental deliveries and

29

collections, writing the employee's own sales reports, revising the employee's own catalog, planning the employee's own itinerary and attendance at sales conferences. Id., C.F.R. § 541.503.

Drivers who deliver the employer's products to the employer's customers are exempt outside salespersons only if they are engaged for the purpose of making sales, are customarily and regularly engaged in making sales, and their performance of nonexempt work is sufficiently limited. Id. at § 541.505(a). As previously noted, the nonexempt work may not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employer. Id. at § 541.5(b). A determination of whether the driver is actually employed for the purpose of making sales is based upon the character of the job as a whole, taking into consideration all of the duties performed by the employee. 29 C.F.R. § 541.505(a).

Whether the driver is actually employer for the purpose of, is customarily and regularly engaged in, and has as his or her primary function the making of sales may involve consideration of such factors as:

- the driver-salesperson's duties as compared with those of other employees engaged as truck drivers and salespersons,
- the possession of a salesperson's license when such a license is required by law,
- the presence or absence of customary or contractual prearrangements concerning amounts of product to be delivered,
- the description of the employee's occupation in union contracts,
- the employer's specifications as to qualifications for hiring, sales training, and attendance at sales conferences,
- the method of payment,
- the proportion of earnings directly attributable to sales effort, and
- other factors that may have a bearing on the relationship of sales to the employee's work.

30

Id. at § 541.505(e). The time devoted to the employee's various duties is an important but not a controlling element. Id at § 541.505(a). Moreover, whether an employee qualifies as an outside salesperson does not depend on the employee's title or the kind of business in which the employer is engaged. Id. at § 541.505(b).

Work performance incidental to and in conjunction with sales activities will also be considered exempt work, provided that solicitation of customers is frequent and regular. Incidental activities include loading the vehicle with the goods to be sold by the driver-salesperson, driving the vehicle, delivering orders in amounts prearranged by the customer or by contractual arrangement, removing empty containers for return to the employer and collecting payments for the goods delivered. Id. at §§ 541.505(a)-(d).

On the other hand, some promotional activities are considered to be the nonexempt work of driver-salespersons: keeping vending machines stocked, in good operating condition and in good locations; placing point-of-sale and other advertising materials; price-stamping commodities; arranging merchandise on shelves or in coolers or cabinets; rotating stock according to date; stocking merchandise, cleaning and otherwise servicing display cases; and engaging in other promotional activities not related to personal sales. Id. at §§ 541.505(b) and (d). See also Hodgson v. Klages Coal & Ice Co., 435 F.2d 377, 383 (6th Cir. 1970)(soft drink route drivers are not exempt outside salespersons because initial solicitations were made by sales manager and route persons spent most time restocking allotted space with infrequent requests for more space). These activities may be exempt, however, if they are conducted incidental to and in conjunction with the employee's own sales and if the solicitation of the customer is frequent and regular. 29 C.F.R. § 541.505(d).

31

The following characteristics generally indicate that a driver-salesperson is primarily engaged for the purpose of making sales:

- being paid based primarily on volume of sales attributable to personal efforts,
- serving as the only sales contact between the employers and the customers,
- taking orders for products that he or she delivers,
- persuading regular customers to accept delivery of increased amounts of goods or new products, and
- contacting prospective retail customers to solicit orders for the goods he or she sells if the new prospects have authority to commit the customer for purchases.

29 C.F.R. §§ 541.505(b), (c), (d).

Here, under both distribution methods, Plaintiffs as Route Sales Supervisors had to be prepared to drive a route and were called upon to do so at times, if a driver failed to show up for work, or to fill in for a driver who was the responsibility of another Route Sales Supervisor, if that Supervisor was too busy to take the route. Under the direct sales method, Plaintiffs as the Route Sales Supervisors' drive time was reduced, but at times Plaintiffs still had to drive and make delivery of pre-sold products. Plaintiffs as Route Sales Supervisors drove more often when training a new driver, and that driving could last a few days or up to a week. DET did not expect or desire to regularly employ Route Sales Supervisors as drivers, and in many workweeks, Plaintiffs did not have to drive at all.

As Route Sales Supervisors, Plaintiffs' primary task was to maintain positive relationships with the retailers and ensure drivers and salesmen were providing good service to retailers. Plaintiffs were expected to visit each customer on a regular basis and make personal contact with the managers. Plaintiffs would also assist the salesmen in stocking product, removing damaged product,

32

preparing point of sale displays, ensuring ample shelf place for product placement and cleaning windows.

Under both distribution methods, Defendant's method of ordering product from its manufacturers was based upon a complex forecasting system using data including the manufacturer's "inventory target" mandated to Defendant, the season of the year, retailer sales and marketing efforts, manufacturer sales and marketing efforts.

Under the FLSA, drivers who deliver the employer's products to the employer's customers are exempt outside salespersons only if they are engaged for the purpose of making sales, are customarily and regularly engaged in making sales, and their performance of nonexempt work is sufficiently limited. There is insufficient information in the record to support a finding that the Plaintiffs' nonexempt work was limited to twenty-percent or less of their total weekly work hours. Here, the Plaintiffs were engaged in some outside sales activity, but the Court concludes that the Defendant's proof does not satisfy the clear and convincing standard.

Accordingly, the Court concludes that Plaintiffs are not exempt from the overtime requirements of the FLSA under the "outside sales exemption," on the "combination exemption.

For the foregoing reasons, the Court concludes that Defendant's motion for summary judgment (Docket Entry No. 33) should be granted as to Plaintiffs exemption under the Motor Carriers Act and denied as to Plaintiffs exemption under the outside sales/combination exception of the FLSA. With the conclusion on the MCA exemption, Plaintiffs' overtime compensation claims must be dismissed.

An appropriate order is filed herewith.

33

**ENTERED** this the _17th_ day of July, 2006.

WILLIAM J. HAYNES, JR.
United States District Judge